UNITED STATES DISTRICT COURT OF
THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
MARGARET WON,
Plaintiff

v.

COLUMBIA JOURNALISM REVIEW, BRUCE
PORTER, and DANIEL LOEWENTHAL,
Defendants.
------------------------------------------------------------ X

Index No. 13 CIV. 7723

Jury Trial Demand Requested

RECEIVED OCT 31 2013 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff complains and for causes of action alleges as follows:

## PARTIES

1. Plaintiff Margaret Won ("Won" or "Plaintiff") is an individual and is now, and at all times mentioned in this complaint was, a resident of Flint, Michigan where she grew up until she was 18 years old, 1966.

2. Plaintiff, now retired, has previously worked as a real estate developer in Hawaii and has resided in Flint, Michigan since June of 1999 when she moved back to her home town. Plaintiff has worked to cultivate a good reputation.

3. Defendant Columbia Journalism Review ("CJR"), is a highly esteemed academic journal and is now, and at all times mentioned in this complaint was, a bi-monthly publication of the Columbia University Graduate School of Journalism.

4. Upon information and belief, Defendant Bruce Porter ("Porter"), is an individual who is now, and at all times mentioned in this complaint was, a resident of New York, New York.

5. Defendant Daniel Loewenthal ("Loewenthal"), is an individual who is now, and at all times mentioned in this complaint was, a resident of New York, New York.

1

6. As described herein below, Defendants CJR, Porter, and Loewenthal (together, "Defendants") collaborated to defame Plaintiff and invade her privacy on numerous occasions causing her harm and damage to her reputation.

## JURISDICTION AND VENUE

7. Jurisdiction is proper pursuant to 28 USCA § 1332 based on diversity of citizenship and the amount in controversy.

8. Venue is proper based on the location of the Defendants in New York County.

## FACTS

9. Porter is a journalist who has worked at various publications including CJR, and who was not only a former professor of Columbia University Graduate School of Journalism, but also acted as special advisor to the Dean.

10. Loewenthal is a documentary filmmaker.

11. The backdrop for the current defamation perpetrated by Defendants began in October of 1967 with Porter's writing and publication of a sensationalistic front cover story in Newsweek titled, "Gentle Marcy: A Shattering Tale" (the "Newsweek Article"). A copy of the Newsweek Article is annexed hereto as Exhibit A.

12. The Newsweek Article was presented as detailing an interview granted by Plaintiff, but on condition of her anonymity: Porter promised, as he himself later admitted, that he would not use her name so that she would not be identifiable.

13. The Newsweek Article not only used Plaintiff's first name, but also her home town so that she was easily identifiable to her family and acquaintances back home, as Porter later acknowledged.

2

14. The Newsweek Article described Plaintiff as engaging in heavy drug use, casual sex and paying $200 for an illegal abortion, at a time when her mother believed she was working at Macy's in New York City.

15. In the wake of publicity from the Newsweek Article, the radio station WNEW broadcasted what they described as an interview with Marcy which included a phone call to her mother.

16. In fact, the "interview" was done in the private home of one of WNEW's reporters who did not disclose to Plaintiff that any recording was being made during their conversation and Plaintiff at no time consented to being recorded. Parts of this recording, including Plaintiff's private phone call, were later adopted by several music groups in the United Kingdom and made a part of their songs.

17. For nearly four decades, by Porter's own admission, he continued to publically discuss Plaintiff's story and his interaction with her surrounding the Newsweek Article in classes he taught at Brooklyn College and Columbia University Graduate School of Journalism as an example of his own experience exercising poor ethics in journalism.

18. Following years of orally repeating Plaintiff's story, continuing to defame and damage her character, Porter decided to publish a follow-up story in CJR titled "Lost and found" which was published on November 1, 2012 (the "First CJR Article"). A copy of the First CJR Article is annexed hereto as Exhibit B.

19. The First CJR Article re-states much of the defamatory material contained in the Newsweek Article and used to describe Plaintiff's actions and person at that time including but not limited to:

3

   a. "She was high from a steady intake of speed, stp, acid, codeine—whatever friends gave her—and her words gushed out in a breathy voice, with no periods or paragraphs."

   b. "Marcy said she had run away from Flint, MI, after lengthy warfare with her father."

   c. "...she moved in with a 28-year-old pusher she called the Walrus, from her favorite book, Alice in Wonderland. Stoned one day, she injured her leg jumping out of a moving car, and developed an infection after the Walrus treated her with morphine. She said it turned 'beautiful colors, but it hurt.' He got her to a hospital in Windsor, Ontario; she spent two weeks recovering, and then hitchhiked to the Newport Folk Festival."

   d. "...she had lived in two-dozen crash pads, slept on park benches, and was trying to lose weight by taking speed. Someone beat her up with a milk crate in Tompkins Square Park."

   e. "She became pregnant during drug-fogged sex and borrowed $200 for an abortion, then illegal, which was performed in an apartment by a woman who was just out of her teens and made crude jokes during the procedure."

20. In the First CJR Article, Porter acknowledged that he violated the conditions of Plaintiff's consent to the interview used in the Newsweek Article by revealing her first name and home town and admits that therefore Plaintiff was not protected by anonymity.

   a. In describing his experience listening to the WNEW recording made after the Newsweek Article he wrote, "When she came on the air, you could tell from her

4

speedo speech she was flying high. Much to my dismay, she led off by saying how devastated she'd been by the Newsweek article. This reporter had paid her for the interview, she said, and promised not to use her name, only he did. I'd also mentioned Flint, so her parents could easily identify her, something I hadn't bothered to consider."

21. The First CJR Article reveals that readers were so moved by the Newsweek Article that they sent in thousands of dollars for Marcy (who never received their contributions).

22. The First CJR Article explains Porter's admitted continued use of Plaintiff's story in his journalism classes at Brooklyn College and Columbia University Graduate School of Journalism for nearly four decades.

   a. "Now and then I'd think of the Marcy story, and the tape: 'Please, Momma, please still love me when you read it.' Sometimes I'd play it for my class, as an ethics exercise, always hoping students would find some saving grace in what their professor had done."

23. The First CJR Article details Porter's meeting with Loewenthal, who "convinced" him to find Plaintiff and write a follow-up story and their search for Plaintiff starting in her home town.

24. The First CJR Article explains that Porter and Loewenthal's efforts to find Plaintiff were documented by Loewenthal on his camera.

   a. "I told him about Marcy, that I couldn't get her out of my mind... He'd help me. And he'd make a film about our search."

25. The First CJR Article identifies Plaintiff's immediate family: "Other than her first name, all we knew was that she had a brother, Arthur, and a sister named Jeanie."

5

26. As part of their efforts to locate Plaintiff, Porter and Loewenthal contacted the newspaper in Plaintiff's home town, the Flint Journal, with details about Plaintiff taken from Porter's meeting with her in 1967 hoping a new story would assist them in locating Plaintiff.

27. The Flint Journal published a front page article in the print newspaper at their suggestion and there was a link in the online version of the story to the recording made by WNEW in 1967 which Plaintiff had not previously known existed.

28. As a result of the article in the Flint Journal, Porter and Loewenthal were contacted by local citizens one of whom divulged Plaintiff's last name which Porter published in the First CJR Article: "The last name is Bachmann."

29. The First CJR Article goes on to give the full names of Plaintiff's parents:

   a. "Through the obit registry at the Journal, we found Marcy's father and mother, Reinhold and Edith Bachmann, who had died in the '90s. The old man had run a hobby shop in downtown Flint, The Hobby House. The family had lived in the west end of town."

30. Upon tracking Plaintiff down to her childhood home, where she continues to reside, Porter and Loewenthal pressured her to give a further interview and sign releases for Loewenthal's video footage.

31. The First CJR Article was accompanied by a photograph of Plaintiff standing in the doorway of her house where her street number is clearly visible on the doorframe:



**Flashback** The author with Marcy in Flint. After making, and losing, a lot of money in real estate in Hawaii, she says, she bought the house she grew up in and lives quietly on her Social Security check, tending her organic garden.

32. At no time prior to the publication of the First CJR Article did CJR fact checkers reach out to Plaintiff to verify information or give the Plaintiff her opportunity to respond before publication.

33. Following the First CJR Article, there were several follow-up articles in the Flint Journal in Plaintiff's hometown, two more on the front page of the printed newspaper.

34. On December 4, 2012, Porter gave an interview to Dick Gordon, titled "Mea Culpa: An Overdue Apology From A Reporter", in which he recounted much of what had been in the First CJR Article and much of what became the Second CJR Article (defined herein below at ¶ 37 et seq.).

    a. "I said, 'But I just put her name in the draft as Marcy because that's her real name, but she, you know, asked us not to use her real name.' And [my editor]

7

said, 'Well we won't use her last name, and I like the sound of Marcy, and there are hundreds of Marcys out there, and let's keep Marcy.' And I said, 'Fine with me.'"

b. "[I had] mentioned Flint, Michigan, and so she could easily be identified as Marcy from Flint, something that I had given no consideration to whatsoever."

c. Part of the interview re-plays the recording of Marcy made by WNEW after the Newsweek Article without her permission or knowledge.

d. "an aging biker dude type guy with a grey ponytail, his wallet secured by a chain ... said that he knew her back in the '60s, and he gave us her last name, Bachman."

35. When asked by Dick Gordon if he had learned something from finding Plaintiff and publishing the First CJR Article, Porter responded, "The small answer was that I felt very sorry about what I did, and I wouldn't do it again."

36. When asked by Dick Gordon if Plaintiff appreciated Porter's efforts to find her and if she was "okay with" the First CJR Article, Porter responded, "I don't think Marcy is really okay with this. I think she feels that her life was invaded, and I feel that she felt she was taken advantage of."

37. On December 21, 2012, Porter published a second article in CJR, "'Lost and found' follow-up" (the "Second CJR Article). A copy of the Second CJR Article is annexed hereto as Exhibit C.

38. The Second CJR Article begins with a statement "Editors' note" which acknowledges that Plaintiff was unhappy with the inaccuracies in the First CJR Article and "was unhappy about

8

having her saga retold in CJR."

39. Despite the Editors' note, the Second CJR Article goes on to state Plaintiff's maiden name again and admits that there is no independent source for any of the information in the Newsweek Article which was republished in the First CJR Article other than Porter's own notes.

## FIRST CAUSE OF ACTION

40. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 39 as if fully set forth herein.

41. The statement written by Porter and published in CJR that Plaintiff was on drugs including "stp" is false; Plaintiff has not ever used a drug called "stp" and has no knowledge of such a drug.

42. The statement written by Porter and published in CJR that Plaintiff "moved in with a 28-year-old pusher she called the Walrus" is false; Plaintiff never moved in with a drug dealer she called the Walrus. Plaintiff never had a drug dealer.

43. The statement written by Porter and published in CJR that Plaintiff ran away from home is false; Plaintiff left home voluntarily as a legal aged adult but did not run away as a seventeen year old teenager.

44. The statement written by Porter and published in CJR that Plaintiff was seventeen years old at the time of the Newsweek Article is false; Plaintiff was nineteen years old.

45. Based on his admitted knowledge of the recording made without Plaintiff's knowledge or consent by WNEW, Porter knew that Plaintiff objected to these statements at the time the First and Second CJR articles were written and published.

46. Porter's reiteration of these false statements was malicious.

47. CJR's repeated publication of these statements was willful as no fact checker ever contacted Plaintiff in time to allow for corrections to false statements.

48. Loewenthal's assistance to Porter in repeating the exploitation of Plaintiff's personal story and statements damaging to her character was negligent.

49. These false statements about Plaintiff's experience and character are libelous on their face. They clearly expose Plaintiff to hatred, contempt, ridicule and obloquy in her home town and wherever such statements are made public. This is clearly evidenced by the fact that readers later sent in monetary donations after reading the original Newsweek Article. Such statements paint Plaintiff as a person of low character and damage her good reputation.

50. Based on their actions, as set forth in the preceding paragraphs, Defendants are guilty of libel for the defamation of Plaintiff's character.

51. As a proximate result of the above-described publication, Plaintiff has suffered loss of her reputation, shame, mortification, and injury to her feelings, all to her damage in a total amount to be established by proof at trial.

52. The above-described written publications were not privileged because they were published by Defendants with full knowledge of their damaging effect on Plaintiff and selfish reckless disregard of such damage in pursuit of financial gain to Defendants as made clear by the admission of defendant Porter stating that he had "used her like some disaster mannequin" in the Newsweek Article and in the First CJR Article, "Oh Marcy, I thought, I've done it to you all over again!" Because of Defendants' malice in publishing, Plaintiff seeks punitive damages in a total amount to be established by proof at trial.

## SECOND CAUSE OF ACTION

53. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

54. The oral statement made by Porter and published in his interview with Dick Gordon that Plaintiff was on drugs including "stp" is false; Plaintiff has not ever used a drug called "stp" and has no knowledge of such a drug.

55. The oral statement made by Porter and published in his interview with Dick Gordon that Plaintiff "lived [with] a heroin pusher named Walrus" is false; Plaintiff never moved in with a drug dealer she called the Walrus. Plaintiff never had a drug dealer.

56. The oral statement made by Porter and published in his interview with Dick Gordon that Plaintiff ran away from home is false; Plaintiff left home voluntarily as a legal aged adult but did not run away as a seventeen year old teenager.

57. The oral statement made by Porter and published in his interview with Dick Gordon that Plaintiff was seventeen years old at the time of the Newsweek Article is false; Plaintiff was nineteen years old.

58. Based on his admitted knowledge of the recording made without Plaintiff's knowledge or consent by WNEW, Porter knew that Plaintiff objected to these oral statements were made and published in his interview with Dick Gordon.

59. Plaintiff admitted during the course of that same interview with Dick Gordon that he had been wrong to break his promise of anonymity and that the story he had written was damaging as stated in ¶¶ 34-36 of this Complaint.

60. Porter's reiteration of these false statements, and his specific identification of Plaintiff, was malicious.

61. Loewenthal's assistance to Porter in repeating the exploitation of Plaintiff's personal story and statements damaging to her character was negligent.

62. These false statements about Plaintiff's experience and character, are libelous on their face. They clearly expose Plaintiff to hatred, contempt, ridicule and obloquy in her home town and wherever such statements are made public. This is clearly evidenced by the fact that readers later sent in monetary donations after reading the original Newsweek Article. Such statements paint Plaintiff as a person of low character and damage her good reputation.

63. Based on their actions, as set forth in the preceding paragraphs, Porter and Loewenthal are guilty of slander for the defamation of Plaintiff's character.

64. As a proximate result of the above-described publication, Plaintiff has suffered loss of her reputation, shame, mortification, and injury to her feelings, all to her damage in a total amount to be established by proof at trial.

65. The above-described oral publications were not privileged because they were published by Porter with full knowledge of their damaging effect on Plaintiff and selfish reckless disregard of such damage in pursuit of financial gain to Porter as made clear by the admission by Porter in the First CJR Article stating that he had "used her like some disaster mannequin" in the Newsweek Article and, "Oh Marcy, I thought, I've done it to you all over again!" Because of Defendants' malice in publishing, Plaintiff seeks punitive damages in a total amount to be established by proof at trial.

### THIRD CAUSE OF ACTION

66. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 65 as if fully set forth herein.

67. The statements made in the First CJR Article written by Porter and published by CJR identifying Plaintiff's first and last names were made without Plaintiff's consent and expressly against her desire for anonymity.

68. The photograph accompanying the First CJR Article written by Porter and published by CJR identifying Plaintiff's street number was shown without Plaintiff's consent and expressly against her desire for anonymity.

69. These statements and photograph were used by Porter and CJR for trade for financial and professional gain to the detriment of Plaintiff and without Plaintiff's consent.

70. Upon information and belief, Loewenthal's assistance to Porter in repeating the exploitation of Plaintiff's personal story and statements damaging to her character, of tracking Plaintiff down to her home town and forcing her into the public eye invading her privacy was malicious.

71. Based on their actions, as set forth in the preceding paragraphs, Defendants are guilty of invasion of Plaintiff's privacy under New York Civil Rights Law § 51.

72. Based on the fact that Defendants have knowingly used Plaintiff's name and picture for the purposes of trade without first obtaining her written consent, Plaintiff seeks an award of punitive and exemplary damages.

-------------------------- continued on following page --------------------------

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, for:

1. Compensatory damages according to proof;

2. Punitive and exemplary damages;

3. Interest as allowed by law;

4. Costs of suit and attorneys' fees; and

5. Such other and further relief as this court may deem just and proper.

Dated: New York, New York
October 31, 2012

EATON & VAN WINKLE LLP

By: _____
Maxim H. Waldbaum
3 Park Avenue
New York, New York 10016
Tel. No. (212) 779-9910

*Attorneys for Plaintiff Margaret Won*

## VERIFICATION

STATE OF MICHIGAN )
) ss:
COUNTY OF GENESSEE )

Margaret Won, being duly sworn, deposes and says:

I am the Plaintiff in this action. I have read the foregoing Complaint, and know the contents thereof. I make this verification on personal knowledge and under penalty of perjury.

*Margaret E. Won*
Margaret Won

Sworn to before me the
__th day of October, 2013.

*Vernessa Lynn Ryals*
NOTARY PUBLIC

VERNESSA LYNN RYALS
Notary Public - Michigan
Genesee County
My Commission Expires Jan 25, 2018
Acting in the County of _____

15